IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Criminal Action No. 10-56-SLR |
| | ) |
| HONG MENG, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE AND TO DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES the United States of America, by and through its attorneys, David C. Weiss, United States Attorney for the District of Delaware, and Robert F. Kravetz, Assistant United States Attorney, and files the following response to the Motion filed by defendant Hong Meng ("defendant") for a Downward Departure (D.I. 18), as well as to defendant's Sentencing Memorandum (D.I. 19).

Defendant faces sentencing for stealing a cutting-edge, organic electronics trade secret from E.I. duPont de Nemours Corporation ("DuPont"). Defendant acquired the specific trade secret – a detailed procedure that improves the performance and durability of Organic Light Emitting Diodes (OLED) displays – while employed by DuPont as a research chemist working on OLED technology. During that same time period, however, defendant had already established an employment relationship with Peking University's College of Engineering (PKU/COE), and he had begun taking multiple steps to use that position to commercialize his OLED research in the future. To that end, defendant surreptitiously copied and pasted the DuPont trade secret into an unrelated document, which he emailed to his PKU/COE email account in China. Defendant sent the email just one day after he misrepresented to DuPont that he would continue working for the company. Moreover, defendant sent additional trade-

secret chemical compounds to a colleague at Northwestern University, with instructions for his colleague to forward the items to his office at PKU/COE in China.

Defendant undertook all of these actions without informing DuPont, and in express breach of a non-disclosure agreement he entered into with the company. When confronted by the company about his actions in transferring DuPont trade secrets, defendant lied. He continued to lie during the course of a subsequent FBI investigation.

For the reasons set forth below, the United States respectfully requests the Court to deny defendant's motion for a downward departure, as (1) he committed his offense with significant planning and over a lengthy time period; and (2) there is no reasonable basis to treat this defendant, or any other defendant who commits theft of a trade secret, *more favorably* because he is not a United States citizen. Moreover, a substantial prison sentence is warranted to punish defendant for his criminal conduct, to promote respect for intellectual property laws, and to deter this defendant and similarly-situated individuals from stealing valuable trade secrets in the future. Accordingly, the United States requests the Court to sentence defendant to a term of imprisonment of 18 months.

I.   **Background**[1]

Defendant is a citizen of the People's Republic of China and has been a lawful permanent resident of the United States since October 2004.[2] Defendant holds a masters degree from PKU/COE,

---

[1] The background facts are derived from the Presentence Investigation Report (PSR). The government has included with this response the supporting documentation it provided previously to the Probation Office in advance of the PSR, and relies upon that documentation to rebut any factual objections to the PSR. (*See* Attachments A-K.)

[2] On June 22, 2010, United States Citizenship and Immigration Services ("USCIS") denied defendant's naturalization petition on the ground that his conduct in committing the instant offense constituted a crime involving moral turpitude. In addition, USCIS indicated that defendant's offense may also constitute an aggravated felony under 8 U.S.C. § 1101(a)(43)(M). Def's Mot. for

located in Beijing, China, as well as a Ph.D. from the University of California at Los Angeles. Presentence Investigation Report ("PSR") ¶ 10. By all accounts, defendant is a brilliant researcher who has made substantial contributions in the area of organic semiconductors, nanoelectronics, and computing. *See, e.g.,* Def.'s Sent Mem., Ex. 8.

Defendant was formerly employed as a Senior Research Chemist by DuPont, a multinational corporation that creates and markets a wide-variety of products that are placed in interstate and foreign commerce. During his tenure at DuPont, defendant was involved in research in the field of OLEDs, and specifically the organic synthesis of molecules used in OLED technology. OLED technology represents the next generation of display and lighting applications. Over the years, DuPont has spent several million dollars in research and development of OLED technology. PSR ¶ 11.

In Spring 2009, while still employed by DuPont and without company permission, defendant accepted a position as a faculty member at PKU's College of Engineering, Department of Nanotechnology.[3] Defendant previously made overtures to PKU to be hired as a professor as early as December 2005. (Attachment E at 254-55.) PKU, like similar research universities worldwide, seeks to commercialize scientific breakthroughs made by students and faculty. After defendant accepted employment with PKU, he hired an assistant and graduate student; received office space, lab space, and

---

Downward Dep. (D.I. 18), Ex. 1, pp. 37-40.

[3] Defendant admitted in his plea agreement that he accepted a faculty position at PKU while still employed by DuPont, although he contends that he did not receive a salary from PKU. Mem. of Plea Agreement ¶ 3(c). An employment contract found on defendant's computer stated that defendant's employment began on March 1, 2009, and would continue until February 29, 2012. (Attachment B.) An electronic copy of a resume found on defendant's computer stated that his employment with PKU began in May 2009. (Attachment C.) Another document found on defendant's computer, dated May 9, 2009, and entitled "Faculty Meeting Minutes" for the PKU Department of Advanced Materials and Nanotechnology, indicated that the "purpose of this meeting was to . . . welcome teacher <u>Meng</u> Hong to join the department." (Attachment D.)

an email address; and was listed as a faculty member on the PKU website. (Attachments F, G.) Defendant also gave a presentation to a regional Chinese government soliciting funding to commercialize his OLED research at PKU. (Attachment H.) PSR ¶ 12.

In early 2009, DuPont's OLED research efforts resulted in the development of a chemical process that increased the performance and longevity of OLED displays. This breakthrough represented the culmination of approximately seven years of research by DuPont scientists, and the company expended extensive research and development costs in its efforts. The chemical process, which was referred to within DuPont as "Gen III," was considered to be a "trade secret" by DuPont, and the company undertook several measures to protect it. OLED team members were instructed to refer to the process generically as "Gen III," rather than by the specific chemical compounds used in the process; the process itself was kept on a secure database which was password protected; and access to the database was granted only to select OLED team members, including the defendant, or at the discretion of OLED team management. Defendant was aware of these security measures and was aware that the Gen III process was a DuPont trade secret. PSR ¶ 14.

In July 2009, defendant specifically requested the chemical process from a member of the OLED Scale-up group.[4] The particular chemical process he requested was the OLED process best suited for

---

[4]Defendant was an OLED synthetic chemist at the DuPont Experimental Station Central Research and Development Center (CRD). The job of a synthetic chemist in the OLED group is to synthesize small quantities of organic semiconductor target materials (typically 0-1 grams) and to provide the materials for testing to the OLED Device group, located at a DuPont facility in Santa Barbara, California. If the Device group concludes that the materials have promising performance characteristics, they provide the target materials to the Scale-up group, located at DuPont's Chestnut Run facility in Wilmington. The Scale-up group produces larger quantities of the materials at a higher level of purity for additional testing. Once the Scale-up group has optimized a process, larger quantities of OLED materials are sent to Santa Barbara for the manufacture of device prototypes.

The role of the Scale-up group is to optimize chemical processes to produce larger quantities

large-scale commercialization of OLED displays. On July 30, 2009, defendant emailed a Microsoft Word document to his PKU email account which contained, embedded on the second page of an unrelated document, the protected chemical process. (Attachment I at 401.) In addition, in August 2009, defendant downloaded the same Word document from his DuPont work computer to a thumb drive, which he subsequently uploaded to his personal computer. As part of his plea agreement, defendant admitted that he knew to a practical certainty that his conduct in misappropriating the chemical process would injure DuPont. The government agreed that it had no affirmative evidence that defendant transmitted the chemical process beyond its initial transfer, via email, to defendant's PKU email account on the PKU computer server. PSR ¶ 15.[5]

In August 2009, defendant mailed a package containing 109 "samples" of intermediate chemical compounds used in organic electronics to a colleague at Northwestern University and instructed his colleague to forward the materials to defendant's office at PKU. Eight of the 109 samples were trade secret chemical compounds whose structures had not been publicly disclosed by DuPont. The samples had been stored in defendant's laboratory at the DuPont Experimental Station in Wilmington. The chemical compositions of these samples were recorded in defendant's DuPont laboratory notebook, which was stamped "confidential." The defendant was aware that the information in his lab notebook, as well as the resulting compounds, were DuPont trade secrets. PSR ¶ 16

The defendant agreed to meet with the government on three occasions for interviews. During the course of the interviews, the defendant misled the Federal Bureau of Investigation (FBI) that he had

---

for commercialization. Because neither the defendant nor other synthetic chemists worked with the trade secret at issue in this case with great frequency, defendant had to specifically request it.

[5] As the government sets forth below, however, that factor does not mitigate the seriousness of defendant's offense.

sent the sample compounds to his colleague at Northwestern with instructions for the compounds to be shipped to China, when he knew that such statement was false. (Attachment K.) PSR ¶ 17.

On October 1, 2010, the government filed a criminal complaint charging defendant with exceeding authorized access of a protected computer, in violation of 18 U.S.C. § 1030(a)(2)(c). Defendant ultimately agreed to waive indictment and, on June 8, 2010, pleaded guilty to a one-count criminal Information, charging him with theft of a trade secret – the DuPont OLED chemical process – in violation of 18 U.S.C. § 1832. In his plea agreement, defendant also acknowledged transferring DuPont secrets to his Northwestern colleague. Mem. of Plea Agreement ¶ 3(f). Defendant further admitted that he lied to the government during the course of interviews with FBI agents. *Id.* ¶ 3(g).

In connection with sentencing, defendant filed a motion for a downward departure (D.I. 18) and a separate sentencing memorandum (D.I. 19). Collectively, the documents request the Court to disregard the applicable Guidelines range and to impose a probationary sentence, or a sentence of home detention.[6] As set forth below, defendant's sentencing arguments are without merit, and this Court should impose a within-Guidelines term of imprisonment of 18 months.

---

[6]In sentencing criminal defendants, this Court follows the familiar three-step process. At step one, the Court calculates the applicable Sentencing Guidelines range. At step two, the Court rules upon any departure motions, stating the effect that its adjudication has upon the Guidelines range. At step three, "after allowing the parties an opportunity for argument, the [C]ourt must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines." *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).

In this case, there is no dispute as to the applicable Sentencing Guidelines range. Because defendant has filed a departure motion, however, the Court is required to rule on that motion prior to considering the § 3553(a) sentencing factors, even though defendant's sentencing arguments overlap in many respects. *See United States v. Lofink*, 564 F.3d 232 (3d Cir. 2009).

## II. The Court Should Deny Defendant's Requests for a Downward Departure

### A. Defendant does not qualify for a downward departure on the basis that his criminal conduct was an aberration

Section 5K2.20 of the Sentencing Guidelines provides that a defendant may receive a downward departure for aberrant behavior in an "exceptional case." The United States Court of Appeals explained that § 5K2.20 requires a sentencing court to make "two separate and independent inquiries" (in no particular order) when considering a departure for aberrant behavior: (1) whether the defendant's criminal conduct constituted aberrant behavior, under the requirements set forth under subsection (b); and (2) whether the defendant's case is extraordinary. *United States v. Castano-Vasquez*, 266 F.3d 228, 234 (3d Cir. 2001) (assuming that a one-time heroin courier could demonstrate that his conduct constituted aberrant behavior, but finding that the district court did not err in concluding that the defendant's case was not sufficiently extraordinary to merit a downward departure). Subsection (b) states that the court "may depart downward . . . only if the defendant committed a single criminal occurrence or single criminal transaction that was (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b).[7] The Court of Appeals has clarified that a defendant must meet *each* of the three definitional characteristics of behavior set forth in § 5K2.20(b) before an aberrant behavior departure can be considered. *Castano-Vasquez*, 266 F.3d at 230.

In this case, the Court should deny defendant's departure request because he cannot demonstrate that he committed his offense without significant planning, or that his conduct occurred over a limited time period. Defendant first made overtures to PKU for a teaching position in December 2005, and he

---

[7] In addition, subsection (c) lists several circumstances, which, if applicable, prohibit a court from departing under § 5K2.20. None of those circumstances apply in the instant case.

eventually accepted employment with the University in 2009. (Attachment E at 254-55; Mem. of Plea Agreement ¶ 3(c).) Documents discovered on defendant's computer suggest that his position began in March 2009 (Attachment B); defendant himself indicated in a resume that his employment with PKU began in May 2009 (Attachment C); and minutes from a PKU/COE faculty meeting dated May 9, 2009, describe that faculty members welcomed Meng to the faculty on that date. (Attachment D.) Moreover, in Summer 2009, defendant gave presentations to a regional Chinese government soliciting funding for OLED research, and to graduate students at Princeton University representing that he was affiliated with PKU/COE and would concentrate his research in the field of OLEDs. Defendant undertook this conduct without company knowledge or permission, and during a time in which he was actively working on Gen III OLED technology. The record demonstrates that defendant placed himself in a perfect position, over a lengthy time period, to collect DuPont OLED technology to later use for his own benefit in commercializing his OLED research at PKU/COE. Under such circumstances, defendant cannot demonstrate that his conduct was aberrant behavior. *See United States v. Dickerson*, 381 F.3d 251, 266 (3d Cir. 2004) (holding that a one-time drug courier, who planned over the course of several weeks a trip to smuggle drugs from the Dominican Republic into the United States, did not qualify for the aberrant behavior departure).

In addition, defendant cannot show that his case is extraordinary. Rather, defendant's case presents a typical fact pattern in trade secrets criminal prosecutions, in which a company insider seeks to profit from company trade secrets. *See, e.g., United States v. Gary Min*, Crim. No. 06-121-SLR. Where the offense conduct presents "ordinary facts and circumstances" found in comparable cases, the aberrant behavior departure is inapplicable. *Dickerson*, 381 F.3d at 265. To this end, the Court of Appeals has rejected the aberrant behavior departure in cases involving one-time drug couriers, whose

personal circumstances and motivations for committing the offense were more compelling than defendant. *Id.* at 265-66 (denying departure where the defendant, a one-time drug smuggler with below-average mental and emotional issues, committed the offense in order to improve her financial situation); *Castano-Vasquez*, 266 F.3d at 230-31 (concluding that the defendant did not demonstrate extraordinariness even though he committed the offense in his fifties, volunteered in his community, suffered from medical problems, and imported drugs on only one occasion to support his family after losing his job).

Accordingly, the government respectfully requests the Court to deny defendant's departure motion under § 5K2.20.

### B. The Court should not depart, nor vary, on the basis of defendant's immigration status

The government objects to defendant's suggestion that he should receive a lesser sentence, via departure or variance, based upon his immigration status. Regardless of the Court's ability, in a particular case, to depart[8] or vary from the Guidelines range based upon a defendant's immigration

---

[8] The government recognizes that the Courts of Appeals are split as to whether a downward departure is permissible based a defendant's status as a deportable alien. Although defendant noted in his brief that several courts have permitted a departure based upon a defendant's deportable status, several other Courts of Appeals have concluded that a defendant is ineligible for a downward departure based upon the effect that the defendant' status as a deportable alien will have on his conditions of confinement. *See United States v. Veloza*, 83 F.3d 380 (11th Cir. 1996); *United States v. Nnanna*, 7 F.3d 420, 422 (10th Cir. 1993); *United States v. Restrepo*, 999 F.2d 640 (2d Cir. 1992); *United States v. Mendoza-Lopez*, 7 F.3d 1483 (10th Cir. 1993); *United States v. Alvarez-Cardenes*, 902 F.2d 734 (9th Cir. 1990).

This Court, however, need not resolve that issue in this case. Even assuming that defendant is eligible for a downward departure based on his alienage, the Court may only depart if it concludes that defendant's "status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement." *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (*citing Koons v. United States*, 518 U.S. 81 (1996)). As the D.C. Circuit stated in *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) – a case relied upon by defendant in his brief –"the circumstances

status, the Court should decline to do so under the facts of this case. Indeed, this case presents the least appropriate situation in which an immigration-based departure or variance would be appropriate.

Defendant is a Chinese national. He solicited, and was later recruited by, a Chinese University to conduct research for commercialization in a particular subject area. Defendant used his status as a lawful permanent resident to steal a valuable trade secret that would help him in his efforts. Defendant's ties to both China and the United States provided him with a unique opportunity to commit the offense – which he willingly exploited to his benefit. As one example, defendant sent an email to his contact at the PKU/COE on July 6, 2009, in which he attached an article listing the breakthrough that DuPont had made in OLED display technology. In the email, defendant stated:

> Just for your reference, recently, our DuPont made a great break-through in OLED material development achieved the longest blue and green life time addition with the red life time improvement. All solution process devices! I am proud to let you know I am one of the key contributors and is the first inventor of the new materials (8 key patents filed based on the new technology). *Though DuPont tried to keep me in the US, I have to consider the family issue and the future development. I firmly believe it is the time I should come back to our country and contribute the rest of my life.*

---

justifying a downward departure on account of the deportable alien's severity of confinement may be quite rare":

> The range of factors that the Bureau [of Prisons] may consider in its assignments is almost illimitable, and it may be hard for a sentencing court to say whether the fortuity of being a deportable alien is likely to have any independent effect. Partly this is due to the basic complication of assessing any multifactor decision, especially a decision that will not yet have been made and may in any event never be backed by any formal explanation. Further, if deportable aliens who are ineligible for minimum security facilities are not so very different from U.S. citizens who are typically assigned to higher security institutions, then it might be hard to say that their status *alone* has caused an increase in severity. . . . To put it another way, in trying to assess whether deportable alien status *per se* will really affect assignment, it may be hard to identify an *otherwise identifiable* citizen to serve as a benchmark.

*Smith*, 27 F.3d at 655 (emphasis in original).

(Attachment J (emphasis added).) Defendant's intent to his benefit his Chinese employer, thus, is unmistakable.

Defendant should not be rewarded for such conduct. Rather, he should be punished for using his legal status in this country in an attempt to benefit himself and his employer in another country. Treating defendant less harshly because he is *not* a United States citizen would encourage other countries to plant their citizens in this country to steal United States technology, without the threat of real consequences, before returning to their homeland. In this respect, individuals who intend to leave the United States with important technology, with the likelihood of never returning, are much greater threats to national interests than United States citizens who commit similar offenses.

The government further rejects defendant's generalizations regarding the consequences he will suffer solely as a result of his immigration status. For example, defendant asserts that the Court should impose a lower sentence because defendant's status will render him ineligible to serve the remaining 10% of his sentence in a halfway house or Community Corrections Center (CCC) as a "Deportable Alien, Public Safety Factor." *See* BOP Program Statement 7310.04, p. 10. Yet, not all "Deportable Aliens" receive a "Public Safety Factor" and are ineligible from receiving the benefit of a halfway house or CCC:

> The PSF shall not be applied, or shall be removed when the U.S. Immigration and Customs Enforcement (ICE) or the Executive Office for Immigration Review (EOIR) have determined that deportation proceedings are unwarranted or there is a finding not to deport at the completion of deportation proceedings. The Institution Hearing Program CMA of NO IHP or IHP CMP ND will then be applied. Additionally, the PSF shall not be applied if the inmate has been naturalized as a United States citizen.

BOP Program Statement 5100.08, p. 9.

Indeed, defendant maintains that he may have valid defenses to deportation. If successful in those efforts, defendant may not be precluded from serving the remaining portion of his sentence in a

halfway house or CCC. As a result, there are inherent uncertainties as to how defendant's immigration status will affect his confinement at this stage in the proceedings. *Smith*, 27 F.3d at 655.

Even if defendant in ineligible for placement in a CCC, this should not provide a basis for a departure or variance. From a public safety and risk of flight perspective, it is reasonable for the BOP to treat *certain* deportable aliens who are "Public Safety Factors" differently than other inmates. *See Restrepo*, 999 F.2d at 645 ("Even if it were a steadfast policy of the Bureau to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines."). Moreover, the Program Statement lists eight additional categories of inmates who also are ordinarily ineligible to participate in a CCC program. *Id.* at 10-11. Under defendant's logic, this Court should reduce the sentences for those types of offenders – including sex offenders, inmates with unresolved charges and detainers from other jurisdictions, and inmates who fail to participate in specific BOP programs – because they are ineligible for placement in a CCC.

Furthermore, defendant's claim that he will be subject to indefinite confinement in immigration custody following his release from imprisonment fails to consider that all aliens who are subject to deportation proceedings may be detained. 8 U.S.C. § 1226(a); *see Restrepo*, 999 F.2d at 640. "Since a deportable alien may be detained though he has not been convicted of a crime, a detention that occurs pending deportation following a convicted alien's completion of his term of imprisonment should not be viewed as a detention resulting solely from his conviction." *Id.* Thus, the possibility that defendant

may be detained following his release from federal custody is a prospect faced by all illegal aliens, and does not present an extraordinary situation to justify a departure.[9]

In addition, defendant may be eligible for voluntary departure from the United States – either in lieu of being subject to immigration proceedings, or prior to the completion of immigration proceedings. *See* 8 U.S.C. §§ 1229a, 1229c(a). Defendant has impliedly referenced this provision in his motion by offering to waive any defenses to deportation and agree to immediate deportation. Def.'s Departure Motion, ¶ 4.[10] Defendant certainly could renew his waiver position upon release from federal custody and avoid any additional detention in immigration custody.

In summary, defendant's status provided him with unique access to commit his offense, under circumstances that warranted a greater threat to national interests than had the offense been committed by a similarly-situated United States citizen. Furthermore, it is unclear whether defendant's status will cause him any "unusual or exceptional hardship in his conditions of confinement" within the BOP or with respect to any subsequent confinement by immigration authorities. Under such circumstances,

---

[9] Under federal immigration law, defendant is eligible to be released from custody on bond if he is not subject to mandatory detention, 8 U.S.C. § 1226(c). Not all criminal aliens are subject to mandatory detention. If defendant is not subject to mandatory detention, he may be eligible for an immigration bond if he demonstrates by clear and convincing evidence that (1) he poses no danger to the safety of other persons or property; and (2) he is likely to appear for any scheduled proceedings. 8 C.F.R. § 236.1(c)(3). Thus, defendant's statement that he will serve up to 15 months in immigration custody following his sentence – which represents the average length of a case to move through immigration court for all aliens, not just those in custody – is speculative at this point in the proceedings.

[10] Contrary to defendant's assertion, the Court does not have the ability to depart downward on a defendant's offer to waive deportation defenses and consent to removal *unless the government joins in the request*. *United States v. Marin-Costenada*, 134 F.3d 551, 555 (3d Cir. 1998) ("The recommendation of the United States Attorney, while it may not be sufficient to convince a district court to depart downward on this basis, is at least necessary for such a decision."). The government does not join in defendant's request in this case.

there is no basis for the Court to depart, or vary, from the applicable Guidelines range based solely on defendant's status as a deportable alien.

### III. The Section 3553(a) Sentencing Factors Warrant a Sentence of 18 months' Imprisonment

#### A. Defendant committed a serious intellectual property offense that risked the exploitation of valuable U.S. technology to China

Defendant's commission of a serious intellectual property offense that risked the exploitation of valuable U.S. technology to China necessitates a term of imprisonment. Congress enacted the Economic Espionage Act of 1996 (EEA), 18 U.S.C. § 1831 *et seq.*, out of a recognition that the protection of our nation's intellectual property is directly related to interests of national security:

> There can be no question that the development of proprietary economic information [trade secrets] is an integral part of America's well-being. Moreover, the nation's economic interests are a part of its national security interests. Thus, threats to the nation's economic interests are threats to the nation's vital security interests.

H. Rep. No. 788, 104th Cong., 2d Sess. 4 (1996). *See United States v. Hsu*, 155 F.3d 189, 194-95 (3d Cir. 1998). To demonstrate the need to coordinate a nationwide response to the enforcement of intellectual property offenses, Congress recently created the Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC). *See generally*, "IPEC 2010 Joint Strategic Plan on Intellectual Property Enforcement," available at: http://www.whitehouse.gov/sites/default/files/omb/ assets/intellectualproperty/intellectualproperty_strategic_plan.pdf (Accessed October 7, 2010) (stating that strengthened intellectual property enforcement is necessary to grow the U.S. economy, create jobs for American workers and support for U.S. exports; to promote innovation and security of America's comparative advantage in the global economy; and to protect national and economic security).

Defendant's conduct in this case represented a concrete threat to our nation's economic interests. OLED technology promises highly-efficient, paper-thin computer or other displays, as well as the next generation of energy-efficient lighting systems. Published reports have estimated the OLED display market will be worth up to $8.1 billion by 2015, *see* "Global OLED Market Expected to be Worth $8.1 Billion in 2015," available at: http://www.azom.com/news.asp?newsID=19307 (Accessed October 7, 2010); and news articles have touted the potential for growth in the OLED lighting market. *See* "Panels of Light Fascinate Designers," THE NEW YORK TIMES, Sept. 6, 2009, available at: http://www.nytimes.com/2009/09/07/technology/07bulb.html (Accessed October 7, 2010).

DuPont designs and manufactures the underlying chemical compounds that eventually comprise OLED devices, which it then markets to end producers. Recently, the company announced it has developed an OLED printing process that will allow it to mass-produce an affordable big-screen OLED display. *See* "DuPont Says It Is Working on an 'Affordable' OLED TV," THE NEW YORK TIMES, May 21, 2010, available at: http://gadgetwise.blogs.nytimes.com/2010/05/21/dupont-says-it-is-working-on-an-affordable-oled-tv/ (Accessed October 7, 2010) (noting that the method perfected by DuPont will allow a 50-inch OLED display to be printed in less than two minutes). The company has apparently succeeded in its efforts to harness this emerging technology where others have failed. *Id.*

The specific trade secret stolen by defendant in this case was a breakthrough chemical process that increased the performance and longevity of OLED displays – one of the most significant OLED accomplishments to date. Defendant was aware that the DuPont advancement was significant: in fact, he emailed a copy of a DuPont news release touting the achievement to a colleague at PKU/COE.

(Attachment J.) Defendant's conduct thus knowingly threatened the economic interests of DuPont, in a market segment in which the company has gained a significant competitive advantage.

The seriousness of the offense is amplified by defendant's intent to commercialize OLED technology for the benefit of PKU/COE, in an effort to "contribute to his country." (Attachment J.) Defendant's transfer of the DuPont trade secret to his PKU/COE email account risked the exploitation of U.S. technology to another nation in an emerging market filled with profit potential. Although the government has no affirmative evidence that the trade secret was transferred beyond defendant's PKU email account, it remains in the hands of a third-party, a major Chinese research institution. To a significant extent, DuPont will have to rely upon PKU's representations that the University will not use the trade secret to its benefit. Although DuPont could take legal action in Chinese courts, the enforcement of intellectual property laws in that country presents numerous challenges.

Furthermore, the manner in which defendant committed this offense was particularly serious. In this respect, defendant's conduct can be compared to that of Gary Min, a former DuPont scientist whom this Court sentenced to 18 months imprisonment on November 6, 2007. *See United States v. Gary Min*, No. 06-121-SLR (D.I. 28). Whereas Min stole a vast array of DuPont trade secrets, most of the trade secrets were unrelated to his job responsibilities. In addition, Min did not have a definitive plan to use the trade secrets in the future. In contrast, defendant targeted a specific trade secret within his area of expertise with a particular plan to commercialize the technology in the future. Moreover, defendant intended to execute his plan outside the United States. The government suggests that Meng's conduct was more serious, and represented a greater threat to DuPont's interests. Thus, defendant should, at the very least, be sentenced similarly to Min.

Accordingly, a sentence of imprisonment of 18 months is appropriate to recognize the seriousness of defendant's offense.

### B. Defendant's history and characteristics enabled him to commit the offense

As set forth above in responding to defendant's departure motion, defendant's status as a world-class scientist enabled him to commit this specific offense. In some cases, the absence of a criminal record may be a mitigating factor in considering the history and characteristics of a defendant. In a theft of trade secrets case, however, the mitigative effect of a non-existent criminal record is diminished. That is because an offender like defendant may only gain access to sensitive technology by demonstrating competence and gaining the trust of his employer over a lengthy time period.

In this case, defendant betrayed the trust that his company placed in him, by placing his own personal advantage ahead of his company and colleagues. After defendant accepted employment with PKU, he continued to work on Gen III OLED technology at DuPont. Tellingly, defendant emailed the trade secret chemical process to his PKU email account the day *after* he informed DuPont that he was accepting the company's employment offer to transfer to DuPont China. As a result, defendant disregarded promises he made in his employment agreement not to transfer DuPont trade secrets to a third party. When confronted, defendant continuously lied about his actions – to DuPont corporate security, his colleagues, and the FBI.

The government urges the Court to consider defendant's demonstrated course of conduct, over a lengthy time period, in evaluating his overall character at the time of sentencing.[11]

---

[11] Given defendant's past misstatements to DuPont and the government, the government treats defendant's claims of <u>post-charge</u> rehabilitative efforts with heightened skepticism.

### C. A substantial prison sentence is warranted to punish defendant for his criminal conduct, to promote respect for intellectual property laws, and to deter this defendant and similarly-situated individuals from stealing valuable trade secrets in the future

A term of imprisonment of 18 months also furthers the remaining sentencing goals listed in § 3553(a).

A substantial prison sentence will satisfy the important sentencing goal of deterrence and promoting respect for the law. The government files charges in criminal theft of trade secrets cases infrequently. In most cases, the charge involves situations where the technology transferred threatens important economic interests. An 18 month sentence will serve notice that stealing valuable trade secrets is a serious offense, deserving of significant punishment. It will also promote respect for intellectual property laws, particularly in light of the national priority to enforce intellectual property offenses. Finally, an 18 month sentence will deter this particular defendant from engaging in similar conduct in the future.

### IV. Conclusion

For all of these reasons, the government respectfully requests the Court to impose a sentence of 18 months' imprisonment.

Respectfully submitted,

DAVID C. WEISS
United States Attorney

*Robert F. Kravetz*
Robert F. Kravetz
Assistant U.S. Attorney

Dated: October 12, 2010